Thank you, Your Honor. My name is Brent Dorian Brame, and I represent Melchor Inciong, the plaintiff appellant in this matter. If I may, I'd like to try and save two minutes for rebuttal. I'll do my best to help you. Thank you. All right. In finding that Fort Dearborn properly terminated disability benefits, the district court erred in multiple ways. Today, I'd like to discuss three reasons which this Court for, excuse me, three reasons why this Court should overturn the district court's decision. The first is the district court determined objective evidence of Mr. Inciong's subjective symptom of, sorry, it demanded objective evidence of Mr. Inciong's subjective symptom of fatigue. What's improper given the fact that the district court was sitting as the trier of fact in holding the claimant to that standard of proof? There are two reasons. He's got the burden of proof, doesn't he? He does have the burden of proof, but his burden of proof is governed by what the plan's term says. In U.S. Airways v. McCutcheon, the Supreme Court said the focus of all of these heuristic cases needs to be on the plan's terms. And here, the plan does not have an objective evidence criteria. It, in fact, does not say or require Mr. Inciong to provide objective evidence. But we frequently will uphold adverse credibility findings based on the fact that there are other objective facts in the record that are inconsistent with the version being offered, in this case by the claimant. And what's wrong with that? What's wrong with making an adverse credibility determination? Yes. I guess there's nothing in this case wrong with making an adverse credibility determination. But if you're making that finding based off of an absence of objective evidence, a standard which is not required by the plan, and I would submit Is it forbidden by the plan? It's not forbidden by the plan. A trier of fact may say, look, I hear what you're saying, but I need something more and you don't give me anything more. What's wrong with that? It may not be required by the plan, but so? If the trier of fact doesn't believe it, what's wrong with that? What's the standard review here with regard to factual findings is clearly erroneous. Why is that clearly erroneous? Because, as the Supreme Court said, in ERISA cases, the evaluation is about what the written contract says. And if the written contract doesn't say that Not as to the factual findings. And that's the second part of why I advance that the district court erred in requiring objective evidence. And that's that objective evidence of fatigue, which is the primarily, one of the two primary disabling symptoms that Mr. Insung is claiming, fatigue and stress, does not lend itself to objective evidence. So the requirement that the court was imposing on Mr. Insung was akin to requiring him to provide evidence that cannot That's not totally true. Well, as I understand the record, the surveillance showed that your client was regularly going to a fitness gym and spending an hour and a half or more at the gym from which, presumably, a fact finder could infer that he was working out. Now, if he's got the physical stamina to work out for an hour and a half at the gym, isn't that objective evidence that the district court could properly consider in determining whether or not his claim that he suffered from such debilitating fatigue that he couldn't concentrate for an eight-hour period of time was, shall we say, exaggerating his symptoms? I would advance that it's not exaggerating his symptoms. Mr. Insung never said that he couldn't go to the gym. In fact, medical records That's not my question. My question is why is it improper for the finder of fact to consider that evidence in determining that his description of his symptoms are overstated? Because I don't believe it supports the contention that they're overstated. Him going to the gym for an hour does not equate to his ability to go to work for an eight-hour day in a stressful work environment. And one which requires, as most That it's not relevant at all as a matter of law that it was improper to consider, as I read the medical reports, he presents as a well-nourished person in, you know, good physical condition. Can the district court not consider that? The district court can. And early on in this claim, it was determined that Mr. Insung did appear, his physical appearance was not one of being a disabled individual, as one might, you know, limps or some other outward sign using a cane. He outwardly appears to be a normal individual. And that was also shown, I believe, on the videotapes that were taken of him walking to and from and so on, right? Well, there was a statement by the claims bureau who took the statement that he appeared to be a well-nourished and robust individual. And, of course, in el- Can't the finder of fact rely on that as yet another objective piece of evidence to suggest that he's not so fatigued or lacks such stamina that he can't do light or sedentary work? It can, but not at the expense of considering the file and the history of the claim on the whole. Part of Mr. Insung's treatment, as advanced by his medical providers, is that he maintains as robust a physical appearance as he can because he has a compromised immune system. And part of treatment of keeping his aids at bay is maintaining as much muscle as he can and maintaining as much physical stamina as he can. That doesn't mean that he doesn't suffer from or fatigue easily. That's something that Dr. Gottlieb consistently makes clear. Dr. Gottlieb is, of course, an expert in this disease. He has no problems with the fact that Mr. Insung is going to the gym. In fact, he recommended he go to the gym as part of his treatment. Yet he continues to advance symptoms that Dr. Gottlieb say contribute to Mr. Insung's disability. But these are symptoms that Dr. Gottlieb apparently decided not to document in his treatment notes towards the end of the treatment? He explains that he does not document the complaints of fatigues in his treatment records because he deems that to be longstanding and permanent. He says he focuses on issues that he can treat. Why couldn't a finder of fact look at that and say, look, this is a doctor who's obviously established, what, a 15-year relationship with a patient? And he clearly was disabled at the outset 15 years ago when the benefits were being paid. But now the patient has progressed to the point where he is no longer totally disabled, but the doctor is trying to help the patient by finding these disability forms when, in fact, his treatment notes don't support the current assessment. Well, I would disagree with that on two. That a finder of fact couldn't look at that evidence and reach the conclusion of my hypothetical? Well, perhaps. But you would need to look at it again in the broader context of this is a long claim. And I agree. His condition when he was hospitalized in Ohio with pneumonia was different than his subsequent history over the following. Clearly better today than he was then. Absolutely. So the question that Judge Armstrong had to decide was, has his condition improved to the point where he's no longer totally disabled from being able to hold gainful employment at a job that he's otherwise qualified and able to do? Isn't that what she had to decide? Yes. And the evidence doesn't support that there was that form of improvement. In fact, there was no change from early in the 2000s through the termination. But there was change. His condition has improved. From the early 2000s, not in 1994 when he was suffering from pneumonia. But I'm not sure where that gets us. The company starts paying benefits. I don't think it's under obligation to prove that his condition is unchanged. It makes an assessment at a later point in time and says, at this point in time, he does not qualify as disabled. But as late as April of 2007, the company makes an affirmative review of the evidence, evidence that is materially unchanged from when it terminates benefits, and decides that, yes, in fact, this does support his disability. Those are the APS forms from Dr. Gottlieb. This is recognizing the levels of his CD4 counts and his biological loads are consistent with when they terminate benefits. What do we do with the fact that the company then had two different independent medical consultants look at Dr. Gottlieb's treatment records over the course of the 15 years, and then they tried to call or contact Dr. Gottlieb to speak with him about, I guess, some missing records or maybe some concerns that they had, and he ducked their calls. Is that something that the prior fact can factor into the veracity of the evaluation that Dr. Gottlieb submitted late in the game? I would say no, because, one, I don't think it's accurate to say that Dr. Gottlieb was ducking any calls. The documents that I read show multiple phone calls, letters. This is our second letter requesting information. And he does respond. He responds to the first doctor, writes a letter explaining why he disagrees with the assertion. That letter is then never transmitted again to that same reviewing doctor. The subsequent doctor, the second reviewer, it claims that he did make these calls. Now, why Dr. Gottlieb didn't respond is unknown. But does it matter? I guess the question I asked you was why isn't that a fact that a fact finder can consider in deciding whether or not what Dr. Gottlieb is saying is correct? Because I don't think Dr. Gottlieb not returning a phone call has any material or medical significance regarding whether Mr. Insjong, who is admittedly suffering from AIDS and has been for 15 years, and we have a long history of recording what his... Not that he has a chronic disease doesn't answer the question as to whether he's totally disabled. Lots of people have chronic diseases that are well controlled by various medical treatment protocols. And it looks to me like we've made incredible strides in the treatment of people who are HIV positive. That's great. But the question is, is he disabled so that he still can't work? Do you want to save some time? I mean, you're welcome to respond to my question, but... I do, and it looks like I have a minute and a half or so. Well, you've got three and a half minutes left. Until two minutes. Sorry. Thank you. I would advance a simple fact that every single time Dr. Gottlieb is asked to complete an intending physician's statement by Fort Dearborn, he responds. He does this 25 times, and he does it after the termination of benefits in conjunction with the life insurance claim. He's not ducking providing information. He writes a letter in response to Fort Dearborn at the end of the claim. The assertion that he's ducking the claim because he doesn't respond to three phone calls, when he has a history of responding to phone calls throughout the 15-year prior claim, I don't think shows that there's anything sinister or wrong with his analysis. In fact, the medical evidence is completely the same. His opinion is completely the same. I disagree that it impairs his credibility. You may disagree with it, but as a finder of fact, generally, it affects credibility. It affects whether he responsibly returns phone calls. It doesn't say anything about whether his medical evidence is correct.  medical evidence. Do you want to save some time? Yes. Okay. Thank you. Let's hear from counsel. May it please the Court, David Schmidt on behalf of Fort Dearborn Life. Your Honor, I want to jump right to the intending physician's statement submitted by Dr. Gottlieb in the summer of 2015. in which he stated that the plaintiff was ambulatory and not house-confined. I guess we've already settled on the fact that he was ambulatory and not house-confined. But more importantly, in the physical limitations section, he did mention fatigue, and he said that fatigue prevented Mr. Incheon from standing or walking for more than an hour at a time. And that's exactly the limitation that Fort Dearborn used when it went out to do the labor market survey to determine whether there were positions available for Mr. Incheon. So the fact that fatigue supposedly wasn't considered, I think, is not true. I just think that the district court properly determined that, based on all the evidence before it, that there were no physical limitations which would prevent the plaintiff from performing sedentary activity. And in fact, in that APS, Dr. Gottlieb said that the plaintiff had a moderate limitation of functional capacity capable of clerical, administrative and sedentary activity. And using that information, Fort Dearborn then went out and did a labor market survey, a fairly exhaustive one, to try to locate various employers who might hire somebody like the plaintiff who had been out of work for 16 years. That was a specific question that was asked of all of these prospective employers, and the results of the labor market survey were discussed in detail by the district court exhaustively. So in this particular case, the standard of review, I think the court knows the standard of review, and it's that you have to determine whether the district court committed clear error in its findings of fact. And the fact is, is that there are numerous pieces of evidence for the district court that the district court did rely on. It did not rely, as far as I can tell, on the fact, at least alone, the fact that the plaintiff's treating physician didn't return a phone call. The court went on to analyze the evidence itself, looking at the medical information that had been submitted. It really didn't even rely that much on the independent peer reviewers that were retained by the insurance company. The district court pretty much did its own assessment, performed its own assessment of those materials. As far as some of the other physical limitations, the plaintiff, I'm sorry, the appellant's counsel didn't really mention them, but there was some discussion about diarrhea being a problem. And in fact, that was one situation where the peer review physician discounted the diarrhea as a problem, because, well, first of all, it hadn't been documented in the records as to the severity of the problem, such as how it would affect somebody's ability to work. But more importantly, the fact is that somebody with a severe diarrhea problem will have trouble keeping up their weight. And in fact, the plaintiff, during this period when the claim was being reviewed, the plaintiff's weight actually increased by three pounds over a three-month period. So I'd like to ask you, you mentioned the labor market survey. And for me, the big question is, or concern, I guess, would be with your client's position, is that I have some difficulty seeing this person being hired and being able to work on a full-time basis. And I have to apologize, because we have several disability cases this week, and they get a little jumbled up in my mind, but I seem to recall that there was an earlier vocational report that cited a concern about whether this person could be hired. Is that true in this case? That was the appeals vocational review, which came before the labor market surveys. And the labor market survey came in time after the decision had already been made to deny benefits. Is that true? Not after the first decision, but before the appeal. So at the time the decision was made, what the company had was this vocational report that seemed to suggest that he was going to have difficulty being hired. Well, I actually went back and read over the appeal vocational. I read the whole file, obviously. But the appeal vocational review talked more about the concern being the plaintiff's motivation to go back to work, and that during the interview process it was going to be very important for the plaintiff to project a desire to work. And because there were some concerns, apparently, that the plaintiff might not project that desire to work, that's why they went out and got the labor market survey. Really, I have nine more minutes, but I don't have a whole lot to add. I guess what I will do is I will summarize the fact that this is, I think, the judges, you have picked up on the primary issue here, which is did the district court commit clear error in its findings of fact. And throughout the plaintiff's appellate briefs, not once did they really accuse the judge of failing to consider something. They simply disagreed with the judge. They disagreed with the judge's determinations regarding credibility of witnesses, and that's all well and good, but under the standard of review, that's not enough for this court to overturn the district court's findings. And so we believe the district court should affirm, or that this court should affirm the district court. And if you don't have any other questions, I will. I don't have anything more. Okay. Thank you, Justice Sotomayor. With my remaining time, I would like to address three salient points. One was that the district court did fail to consider evidence, and that was the consistent claims that Mr. Insleung cannot tolerate the work stress that would be required for any of the occupations in the labor market survey or any occupation. That was consistently stated by Dr. Gottlieb. It was omitted and not considered at all by the district court. It's also untrue that the labor market survey asked the potential employers whether a person who is limited to one hour of sitting or, sorry, of walking and standing per day could perform this occupation. Rather, it asked them whether a person with a sedentary capacity who had the ability to change positions at will could perform the job. That does not state in any of the perspectives that he could work at home for that particular position. And that is true. And that perspective employs not to be any restriction on his ability to get up and walk around and take a break or go for a walk or take a break. And UnitedHealthcare, who is the person who offered that, was looking for a person who had extensive experience in Medicare, Medicaid, and other health insurance claims. Mr. Insleung had none of that experience. He was simply not. Isn't that a different subject? That doesn't speak to physical disability. That speaks to job training and qualifications. It speaks to the definition of disability, which requires a consideration of its education, training, and experience. If he lacks the experience for a job, he's disabled from that occupation. And finally, I'd go to his desire to work. Mr. Insleung consistently said that he wanted to return to work. The reality is he has to balance his physical limitations, his stress avoidance, and all of the other things that come with his disease to be able to return to work. And whether he wants to or not, he can express this as vehemently as he wants. He has to also be honest with potential employers that he has limitations and that he may need to get accommodation for those limitations. Anything else? There's no further questions? I don't think we have any more questions. Thank you both. The case just argued is submitted. We'll get you an answer as soon as we can.
judges: Duffy, Tallman, Clifton